HOLYOKE WATER POWER COMPA-
NY and Holyoke Power and
Electric Company, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

New England Power
Company, Intervenor.

No. 85–1052.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 10, 1986.

Decided Aug. 22, 1986.

As Amended Aug. 22, 1986.

Robert P. Wax, with whom James R. McIntosh, Hartford, Conn., was on brief for petitioners.

John N. Estes, Atty., Federal Energy Regulatory Com'n, Washington, D.C., for respondent.

Barbara J. Weller, Deputy Sol. and Leslie J. Lawner, Atty., Federal Energy Regulatory Com'n, Washington, D.C., were on brief, for respondent.

Peter G. Flynn, Providence, R.I., was on brief for intervenor, New England Power Co.

Before STARR, Circuit Judge, J. SKEL-LY WRIGHT and MacKINNON, Senior Circuit Judges.

STARR, Circuit Judge:

Under the well-settled doctrine known as *Mobile-Sierra*,[1] the legality of a proposed rate increase by a seller of electric power turns on the terms of the contract governing the relationship between the purchasers and seller of electricity. This case calls upon us to review the Federal Energy Regulatory Commission's interpretation of a contract executed in 1957 concerning the sale of electric power in Massachusetts. For the reasons that follow, we defer to the Commission's interpretation of the contract and deny the petition for review.

---

1. *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *see Richmond Power and Light v. FPC*, 481 F.2d 490, 492–493 (D.C.Cir.), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973). The rate-setting provisions of the contract are controlling except when overriden by the Commission's power to adjust rates in the public interest. *Mobile*, 350 U.S. at 344, 76 S.Ct. at 380; *Cities of Bethany v. FERC*, 727 F.2d 1131, 1142 (D.C.Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984).

## I

In the mountains of Western Massachusetts is situated the 148–megawatt Mt. Tom electric generating facility. The plant is owned and operated by the Holyoke Water Power Company (HWP). HWP sells the entire output of the Mt. Tom plant to its wholly-owned subsidiary, Holyoke Power and Electric Company (HP & E), which under the terms of the same agreement sells 39% of Mt. Tom's output back to its parent company, HWP. Under a separate contract, HP & E sells 23% of the Mt. Tom facility's output to Western Massachusetts Electric Company, an affiliate of the two Holyoke Companies (Holyoke) and a wholly-owned subsidiary of Northeast Utilities situated to the south in Hartford, Connecticut. Under the third and last contract, HP & E sells the remaining 38% of Mt. Tom's output to New England Power Co., which is neither an affiliate nor otherwise a part of the Northeast Utilities system. In the background is the final member of the cast of characters, the First National Bank of Boston. First National is a party to each of the three power contracts as trustee under a mortgage indenture and deed of trust between Mt. Tom's owner, HWP, and the Old Colony Trust Company, which provided the original construction financing for the facility and to whose duties and privileges First National has succeeded.

Each of the power contracts prescribes monthly rates based on a demand charge and an energy charge.[2] Thirty pages of the contract are devoted to specifying the components of the cost-related formula for determining those charges. The contract formula rate proved satisfactory to all the parties from the inception of Mt. Tom's operations in 1960 until the last day of July 1984,[3] when Holyoke filed a proposed unilateral rate increase with the Commission. Holyoke justified its proposed rate on the ground that the rate formula agreed upon by the parties caused it "to earn an inadequate rate of return." Brief for Petitioners at 11.

While the affiliated companies all fell into line with respect to the price hike, as did First National as trustee, New England Power objected. In its filings of protest, New England Power contended that Holyoke's proposed unilateral rate increase was not permitted under the contract and was thus illegal under the *Mobile-Sierra* doctrine. First, New England Power argued that the contract provides for a specified rate formula not subject to unilateral modification by Holyoke. Second, it argued that the contract specifically provides for only one situation, not applicable, in which the seller could effect a unilateral rate increase. In response, Holyoke argued that the contract authorized the challenged price hike by virtue of a contractual provision expressly incorporating Massachusetts law, including a provision of state law permitting unilateral rate increases subject to temporary suspension and subsequent modification by the governing regulatory authority.

Acting with dispatch, the Commission suspended the proposed rate increases pending review of the contract in light of the *Mobile-Sierra* arguments advanced by New England Power. Shortly thereafter, the Commission adopted an interpretation of the contract that partly incorporated the competing positions of both Holyoke and New England Power. The Commission agreed with New England Power that the rate formula contained in the contract would, standing alone, prohibit any rate changes not agreed upon by the parties. But the Commission also agreed with Holyoke that the contractual reference to state law reflected the parties' intent that the contract rate be subject to review and determination by the pertinent regulatory body. The Commission declined, however,

2. Although New England Power did not challenge Holyoke's attempt to amend the other two contracts, the Commission examined all three contracts because they contain substantially identical provisions. Joint Appendix at 217.

3. Over this twenty-four year span the parties made only six minor amendments, all by mutual consent.

to embrace Holyoke's position that the contractual reference to state law conferred upon Holyoke the right to change rates *prior* to approval of the governing regulatory body. On the heels of the Commission's denial of rehearing in January 1985, Holyoke filed the present petition for review.

## II

Holyoke's principal argument before us is that the Commission misinterpreted the significance of the reference to Massachusetts law in section 6.06(a) of the contract.[4] It is undisputed, however, that in construing this contractual provision FERC applied the proper legal principle that "state law is relevant only to the extent intended by the parties." Joint Appendix (J.A.) at 219 (Supplemental Order at 4); *see Appalachian Power Co. v. FPC*, 529 F.2d 342, 347 n. 35 (D.C.Cir.), *cert. denied*, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976).

The Commission crafted a reasonable construction of section 6.06(a) in rejecting Holyoke's view that this provision incorporated Massachusetts' procedural mechanism permitting unilateral rate increases. FERC concluded that the reference in section 6.06(a) to "Chapter 164 of the General Laws of Massachusets" triggered the application of section 94A of that chapter. As Holyoke concedes, the Commission's conclusion in this respect was fully justified since under Chapter 164 contracts such as those at issue here are expressly governed by section 94A. *See* Brief for Petitioners at 21. The Commission also adopted Holyoke's position (and rejected New England Power's contrary view) that section 6.06(a) of the agreement subjected the contract rate to review and determination by the regulatory body having jurisdiction. In our view, no other reading of section 6.06(a) was possible in light of the clear language in that provision mandating regulatory oversight and in light of the requirement in section 94A of Chapter 164 that utility contracts provide for such oversight or else be rendered void.

Holyoke faults FERC, however, for failing to draw the inference that the contractual reference to Chapter 164 also unequivocally evinces the intent of the parties to subject the contractual rate formula to section 94 of that chapter, which provides for unilateral rate increases effective upon filing (subject to temporary suspension and later alteration by the regulatory authority). But, as the Commission emphasized in both its orders under review, section 6.06 of the contract by its express terms "only incorporates the provisions of Chapter 164 'insofar as the same *may* be applicable to this agreement.'" J.A. at 219 (Supplemental Order at 4) (emphasis added by Commission); *see also* J.A. at 236 (Order Denying

---

4. Because Holyoke and the Commission find § 6.06(b) relevant to interpreting 6.06(a), we reproduce all of § 6.06 below:

Sec. 6.06 *Regulation:*

(a) This agreement is made subject to present or future municipal, state or federal laws or ordinances and to present or future regulations or orders properly issued by governmental regulatory bodies having jurisdiction, and the obligations of the Parties hereunder are conditioned upon authorization by the Federal Power Commission of the issuance of securities by HWP for financing of the Mt. Tom Facilities, and approval of Exhibit A hereto by the Massachusetts Department of Public Utilities, in accordance with Massachusetts Acts of 1926, Chapter 147.

In particular, the prices to be paid for electricity to be delivered hereunder, as set forth herein, shall be subject to review and determination by the Massachusetts Department of Public Utilities in any proceeding brought under Chapter 164 of the General Laws of Massachusetts, as amended, to the extent provided for and in accordance with the provisions of said chapter, insofar as the same may be applicable to this agreement.

(b) If any reduction in the charges for electricity that would otherwise be payable hereunder is required, at any time or from time to time, by law or by order of any governmental regulatory body having jurisdiction, including courts, HWP and/or HP & E shall be free to take any steps necessary or appropriate in accordance with the then laws and rules, regulations and orders of governmental regulatory bodies having jurisdiction, including the filing of new rate schedules, in order to receive from NEPCO for the electricity sold hereunder amounts no greater than those which would be payable by NEPCO in the absence of such reduction and such amounts shall be paid by NEPCO.

Rehearing at 2). Moreover, Holyoke expressly conceded before the Commission and this court that the requirement for regulatory oversight in section 94A of Chapter 164 may be satisfied by subjecting the contract price to review and determination under *either* section 94 or section 93. *See* Brief for Petitioners at 22–24, 27, 29; J.A. at 197, 225.[5] Holyoke's admission that Massachusetts law permitted "the parties [to] include Section 93 as the only rate review mechanism in their contract," Brief for Petitioners at 27, is quite significant because Section 93 provides for rate changes effective only upon regulatory approval. Thus, this case is entirely distinguishable from those in which the contract incorporated state law and state law allowed for only *one* type of filing. *Cf. Richmond Power & Light v. FPC*, 481 F.2d 490, 500 (D.C.Cir.) (finding contractual reference to state law controlling on issue of whether utility could unilaterally raise rates when state law provided for one rate review procedure), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).

Under these circumstances, the Commission quite reasonably looked to the remainder of the agreement to determine whether the parties intended to incorporate section 94. As the Commission correctly observed, the agreement contains no provision authorizing Holyoke to file rate increases with an immediate effective date (after notice and suspension) whenever it chooses. The absence of such a provision is not surprising in view of the elaborate fixed rate formula set out in the contract. Rather, section 6.06(b) of the agreement allows Holyoke to file a rate increase with an immediate effective date only when the contract rate has been reduced by government order and only in an amount not to exceed the reduction.[6] Those conditions, as all readily

---

**5.** The dissent would grant Holyoke's petition for review on the ground that the Commission failed to recognize that Holyoke's own interpretation of the statute was, in point of fact, erroneous. Dissent at 765–766. We do not, however, reach the merits of the dissent's statutory analysis. This court lacks jurisdiction to reverse the Commission on the basis of an error raised by the court *sua sponte* if the error was not "urged" before the Commission in the rehearing application. 16 U.S.C. § 825*l*(b) (1982); *see, e.g., Federal Power Comm'n v. Colorado Interstate Gas Co.*, 348 U.S. 492, 498–99, 75 S.Ct. 467, 471, 99 L.Ed. 583 (1955) (construing identical provision in section 19(b) of the Natural Gas Act); *Rhode Island Consumers' Council v. Federal Power Comm'n*, 504 F.2d 203, 212 (D.C.Cir.1974) (same). *A fortiori*, we may not reverse the Commission for relying on petitioners' own interpretation of Massachusetts law.

Although this point was never argued by petitioners, the dissent also chooses to elucidate at length on its conclusion that "no utility can initiate a rate change under § 93." Dissent *infra*, at 770 (emphasis deleted). Even assuming this conclusion is correct, we believe it provides no basis for reversing the portion of the Commission's decision which is before us. If rate increases cannot be initiated by a utility under section 93, the Commission arguably erred by allowing Holyoke to seek a prospective rate increase from the Commission. But as all the parties and the dissent recognize, "[t]his important ruling ... is not challenged on appeal." Dissent at 764; *see also* Reply Brief for Petitioners at vii n. 4.

The dissent fears that our failure to reach out and decide these issues may create "precedent that saddles the agency, the reviewing court, and perhaps even future litigants with an incorrect construction of the statute." Dissent at 769. To the contrary, our express refusal to resolve issues on which the dissent opines creates no precedent except for that of deference to the statutory bar on judicial resolution of errors not urged before the agency. Of course, our decision will not bar the Commission from considering the points raised by the dissent if they are presented in a future filing request. Moreover, the dissent wrongly assumes that a court reviewing an administrative decision must resolve all issues of pure law arguably bearing on the correctness of that decision. For example, under settled principles a court will not consider legal bases for affirming an agency's decision that were not relied upon in the agency's decision. *SEC v. Chenery*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The dissent recognizes as much when it refuses to consider New England Power's arguments that specific language in sections 94 and 94A contradicts Holyoke's view that section 94 authorizes unilateral rate increases for purposes of this type of contract. *See* Brief for New England Power at 14, 19.

**6.** Holyoke argues that the office of section 6.06(b) was exceedingly limited in nature, aimed it is said at protecting the trustee—First National—by securing New England Power's express waiver of the right to contest the specific sort of unilateral hike envisioned by that subsection. Assuming this waiver theory should not be avoided as contrary to public policy, *cf. Papago Tribal Utility Auth. v. FERC*, 723 F.2d 950,

admit, are not present here. As a result, we are persuaded by the conclusion of the Commission that its textual analysis of section 6.06(a) was "bolstered" by the specific unilateral-increase vehicle expressly agreed to by the parties in section 6.06(b). J.A. at 220 (Supplemental Order at 5).

In our view, therefore, section 6.06(a) of the contract can reasonably be interpreted to provide for the regulatory oversight required by section 94A of applicable state law without granting Holyoke the right to effect a unilateral modification of the rate formula set forth with great detail elsewhere in the contract. *Cf. Kansas Cities v. FERC*, 723 F.2d 82, 88 (D.C.Cir.1983) (contractual provisions subjecting agreed-upon rates to regulatory oversight are generally construed to authorize rate changes upon approval of the Commission applying a "just and reasonable" standard). Although Holyoke's more expansive interpretation of section 6.06(a) may also be reasonable, we nonetheless cannot overturn a Commission interpretation that is, without doubt, "amply supported both factually and legally."[7] *Gulf States Utilities Co. v. FPC*, 518 F.2d 450, 457 (D.C.Cir.1975), (quoting *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103, 114, 79 S.Ct. 194, 200, 3 L.Ed.2d 153 (1958)).

*Denied.*

954 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984), neither the plain language of the provision nor the contract as a whole requires such an interpretation. At any rate, we cannot reject the Commission's reasonable interpretation of section 6.06(b) because Holyoke offers a plausible, albeit less than compelling, alternative. *See United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 114–15, 79 S.Ct. 194, 200–01, 3 L.Ed.2d 153 (1958); *Kansas Cities v. FERC,* 723 F.2d 82, 87 (D.C.Cir.1983).

7. We recognize full well that the task of interpretation is rendered all the more difficult by the considerable passage of time since the contracts were framed and the rather different legal milieu obtaining then. Nevertheless, the difficulty of the task of divining the parties' intent under changed circumstances is all the more reason for this court to defer "to the judgment of the expert agency that deals with agreements

MacKINNON, Senior Circuit Judge (dissenting):

The Federal Energy Regulatory Commission (the "Commission") interpreted the power contract between Holyoke Water Power Co. and Holyoke Power & Electric Company ("Holyoke") and New England Power Co. ("New England"), to permit Holyoke to initiate rate changes upon a filing with the Commission. However, the Commission held that such rate changes could not be obtained under § 205 of the Federal Power Act, which authorizes unilateral filings, but only under § 206 following a hearing and order of the Commission. The Commission achieved this result by a bizarre construction of the provision of the contract that incorporates the public utility laws of Massachusetts and by ignoring the intent of the parties that is obvious from the sections of the Massachusetts statute that are incorporated into the contract.[1] The majority opinion adopts the Commission's construction of the contract. I therefore dissent.

## I. BACKGROUND

### A. *Federal Statutory Background*

The Federal Power Act provides that utilities may obtain rate increases by either of two methods. First, § 205[2] of the Act

of this sort on a daily basis." *Kansas Cities,* 723 F.2d at 87.

1. The contract was entered into between the parties in 1957 when doubt existed whether state law or federal law would apply. It is now settled that federal statutes apply, but Massachusetts law is relevant because, by the incorporation of Chapter 164 in its entirety into the contract, it expresses the intent of the parties as to whether rate increases may be obtained unilaterally or whether a hearing and approval of the application must first occur.

2. Section 205 provides:
   Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission ... schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission....

.    .    .    .    .

authorizes utilities unilaterally to file proposed rate schedules with the Commission. The Commission may approve the rate to become effective immediately, or it may, upon complaint or upon its own initiative, suspend the operation of the schedule for up to five months, pending the Commission's hearing and decision on the validity of the proposed rate. After the suspension period the rate goes into effect subject to refund if the Commission eventually determines the rate increase to be excessive.

The other method of obtaining a rate increase is prescribed by § 206.[3] Under this section, the Commission must first hold a hearing, in which it finds and determines the "just and reasonable" rate. The rate change is effective only upon order of the Commission.

Both of the above methods require final approval of the rate by the Commission. However, a utility ordinarily may obtain revenue from a rate increase *sooner* under § 205 than under § 206, because currently the hearing procedure generally takes longer than the maximum five-month suspension period. Since rates cannot be imposed retroactively, if the § 206 procedure is followed the utility will never secure an increase for the period it takes the Commission to hold the hearing and announce its decision, even though the rate is found to be just and reasonable as of the earlier date of the financial data filed with the request for the rate increase.

"... Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once ... to enter upon a hearing concerning the lawfulness of such rate ... and pending such hearing and the decision thereon, the Commission ... may suspend the operation of such schedule and defer the use of such rate ... but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classifi-

## B. *The Contractual Background*

Under the *Mobile-Sierra* doctrine[4] the statutory method to be followed by the Commission is controlled by the terms of the contract between a utility and its customers. It is thus necessary to examine the 1957 power contract between Holyoke and the New England Power Company. This examination brings out two provisions of the contract, set forth in subsections (a) and (b) of § 6.06, that the Commission found to be relevant.

Section 6.06(a) of the contract incorporates Massachusetts utility law:

[T]he *prices* to be paid for electricity to be delivered hereunder ... *shall* be subject to review and *determination* by the Massachusetts Department of Public Utilities in *any proceeding* brought under *Chapter 164* of the General Laws of Massachusetts, as amended, *to the extent provided for and in accordance with the provisions of said chapter, insofar as the same may be applicable to this agreement.*

(J.A. 86) (emphasis added).

Section 6.06(b) establishes the procedures to be followed in the event the utility requests a rate increase after a mandatory rate *reduction:*

If any *reduction in the charges for electricity* that would otherwise be payable hereunder is required, at any time

cation, or service shall go into effect at the end of such period ... [subject to possible refund]."
16 U.S.C. § 824d(c), (d), and (e) (1982).

**3.** Section 206 provides:

Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate ... demanded ... by any public utility ... is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate ... to be thereafter observed and in force, and shall fix the same by order.
16 U.S.C. § 824e (1982).

**4.** *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

or from time to time, by law or by order of any governmental regulatory body having jurisdiction, including courts, HWP [Holyoke Water Power Co.] and/or HP & E [Holyoke] *shall be free to take any steps necessary or appropriate in accordance with the then laws and rules, regulations and orders of governmental regulatory bodies having jurisdiction, including the filing of new rate schedules,* in order to receive from NEPCO [New England] for the electricity sold hereunder amounts *no greater than those which would be payable by NEPCO in the absence of such reduction* and such amounts shall be paid by NEPCO.

*Id.* (emphasis added).

The provision of § 6.06(a) of the contract that the "prices to be paid for electricity ... *shall* be subject to review and *determination* by the Massachusetts Department of Public Utilities in *any proceeding* brought under Chapter 164 of the General Laws of Massachusetts," as its plain language indicates, incorporates *all* the statutes that may be relevant to "any proceeding brought under Chapter 164" and requires a thorough examination of that regulatory statute.

### 1. The Referenced Statutes of Massachusetts

Chapter 164 is a comprehensive compilation of Massachusetts law regulating companies selling natural gas and electricity. Three sections are particularly relevant here because of the "proceedings" they authorize. Section 94A provides:

No gas or electric company shall hereafter enter into a contract for the purchase of gas or electricity covering a period in excess of one year ... unless such contract contains a provision subjecting the price to be paid ... to review and determination in *any proceeding* brought under *section ninety-three or ninety-four* .... In any such proceeding the department may review and determine the price to be thereafter paid for gas or electricity under a contract containing said provision for review.

Mass.Gen.Laws Ann. ch. 164, § 94A (1976) (emphasis added).

The clear intent of this section of the statute is to authorize and require *all* power contracts to provide for review and *determination* under the procedures prescribed both by § 93 *and* § 94. This statutory requirement is *not* satisfied by a construction that would subject the "price" to be reviewed or determined under only one of the referenced sections—§ 93 or § 94. The clear intent of the legislature in this section is that the "or" between "section ninety-three" and "section ninety-four" should be read in its conjunctive sense to mean "and." This is often the case. *Union Insurance Co. v. United States,* 73 U.S. (6 Wall.) 759, 764, 18 L.Ed. 879 (1867) (the Court looked "beyond the mere words to the obvious intent" and ruled the word "or" must be taken conjunctively to mean "and"); *De Sylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 976, 100 L.Ed. 1415 (1956); *Swearingen v. United States,* 161 U.S. 446, 450, 16 S.Ct. 562, 563, 40 L.Ed. 765 (1896); *United States v. Fisk,* 70 U.S. (3 Wall.) 445, 447, 18 L.Ed. 243 (1865); *Willis v. United States,* 719 F.2d 608, 612–13 (2d Cir.1983) ("It is settled that 'or' may be read to mean 'and' when the context so indicates."); *Schuler v. United States,* 628 F.2d 199, 201 (D.C.Cir.1980) (en banc), (the "or" in the Federal Tort Claims Act, 28 U.S.C. 2401(b) (1976), is not to be read in the disjunctive but as requiring compliance with *"both"* (emphasis in opinion) the requirement to file a claim within two years *and* to commence legal action within six months of service of notice of final denial of the claim); *United States v. Moore,* 613 F.2d 1029, 1040–43 (D.C.Cir.1979) (legislative intent would be frustrated unless "or" read as "an" in 18 U.S.C. § 1623(d)). "Or" and "and" are generally interchangeable and "one may be substituted for the other, if consistent with the legislative intent." 1A C. Sands, Sutherland Statutory Construction § 21.14 at 127, and cases cited at 127–34, n. 6 (4th ed. 1985). The Commission so interprets § 94 when it applies that statute in conformance with § 6.06(b) of

the contract. It was to comply with the requirement of § 94A that the parties agreed to incorporate Chapter 164 in its entirety into contract. Thus *both* sections are part of the contract.

### 2. Section 93 of the Massachusetts Statute

Section 93 generally regulates consumer complaints. It provides that the Massachusetts Attorney General, local officials, and consumers may complain to the Massachusetts Department (the Department may also act upon its own motion) of the price or service, and the Department after hearing may order a "reduction or change in the price" or service. Specifically the state provides:

> On written *complaint of the attorney general, of the mayor of a city or the selectmen of a town ... or of twenty customers thereof,* either as to the quality or price of the gas or electricity sold and delivered, the department shall ... give a public hearing to such complainant and said company, and after such hearing may order any *reduction or change* in the price ... or an improvement in the quality [of the gas or electricity]....

Such an order may likewise be made by the Department ... upon its own motion. *The price or prices fixed by any such order shall not thereafter be changed by said company except as provided in section ninety-four.*

*Id.* § 93 (emphasis added). Holyoke, as with any private utility, is not a public person or a consumer and hence is not authorized by this section to initiate a rate increase. The last sentence of § 93, which is italicized above, is very significant to this case. It authorizes a utility to file for a rate increase immediately after the Department has ordered a rate reduction, provided, that any change in the rate thereafter *must* proceed under § 94. The plain import of the last sentence of § 93 is to recognize that § 94 provides the general procedure for utilities to seek rate increases.

### 3. Section 94 of the Massachusetts Statute

The full text of § 94 is set forth in the margin so that there may be no doubt about its full meaning.[5] The following ex-

---

**5.** § 94. Schedules of rates, prices and charges; contracts; filing; proposed changes; notices; investigations; hearing

Gas and electric companies shall file with the department schedules, in such form as the department shall from time to time prescribe, showing all rates, prices and charges to be thereafter charged or collected within the commonwealth for the sale and distribution of gas or electricity, together with all forms of contracts thereafter to be used in connection therewith. Rates, prices and charges in such a schedule may, from time to time, be changed by any such company by filing a schedule setting forth the changed rates, prices and charges, but until the effective date of any such change no different rate, price or charge shall be charged, received or collected by the company filing such a schedule from those specified in the schedule then in effect; provided, that a company may continue to charge, receive and collect rates, prices and charges in accordance with a contract heretofore lawfully entered into, or, until the department otherwise orders, after notice to the company and a public hearing and determination that public interest so requires may sell and distribute gas or electricity under a special contract hereafter made at rates or prices differing from those contained in a schedule in effect, providing a copy of the contract in each in-

stance is filed with the department, except that a contract of a company whose sole business in the commonwealth is the supply of electricity in bulk need not be filed except as may be required by the department. Whenever the department receives notice of any changes proposed to be made in any schedule filed under this chapter which represent a general increase in rates, prices and charges for gas or electric service, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes after first causing notice of the time, place and the subject matter of such hearing to be published at least twenty-one days before such hearing in such local newspapers as the department may select. Unless the department otherwise authorizes, the rates, prices and charges set forth in such a schedule shall not become effective until the first day of the month next after the expiration of fourteen days from the filing thereof. Such rates, prices and charges shall apply to the consumption shown by meter readings made after the effective date of such rates, prices and charges, unless the department otherwise orders. So much of said schedules shall be printed in such form and distributed and published in such manner as the department may require.

tracts from § 94 provide that utilities seeking a rate increase shall proceed in a manner substantially similar to the *unilateral* method provided by § 205. In fact, this is the *only* method provided by the statute for a utility to initiate a rate increase. However, the Department if it intervenes "before ... such contract has become effective" may cause a rate increase to be granted only after a public hearing, similar to § 206.

... Rates, prices and charges in [existing rate schedules filed by electric companies] may, from time to time, be changed by any such company by filing a schedule setting forth the changed rates, prices and charges, but until the effective date of any such change no different rate, price or charge shall be charged, received or collected by the company filing such a schedule from those specified in the schedule then in effect.... Whenever the department receives notice of any changes proposed to be made in any schedule filed under this chapter which represent a general increase in rates, prices and charges for gas or electric service, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes after first causing notice of the time, place and the subject matter of such hearing to be published at least twenty-one days before such hearing in such local newspapers as the department may select. *Unless the department otherwise authorizes, the rates, prices and charges set forth in such a schedule shall not become effective until the first day of the month next after the expiration of fourteen days from the filing thereof....*

The department, either upon complaint or upon its own motion, may investigate the propriety of any proposed rate, price or charge and may, pending such investigation and decision thereon, by order served upon the company affected thereby, suspend the taking effect thereof, from time to time, but not for a period longer than ten months beyond the time when such rate, price or charge would otherwise become effective....

Unless the department otherwise orders, all contracts for the sale of gas or electricity by gas or electric companies, except contracts for sale by a company whose sole business in this commonwealth is the supply of electricity in bulk, shall be filed with the department and shall not become effective until thirty days after filing. *The department may investigate the propriety of any such contract, both before and after such contract has become effective,* and may, after notice and a public hearing, make such order relative to the rates, prices, charges and practices covered by such contract as the public interest requires.

The department, either upon complaint or upon its own motion, may investigate the propriety of any proposed rate, price or charge and may, pending such investigation and decision thereon, by order served upon the company affected thereby suspend the taking effect thereof, from time to time, but not for a period longer than ten months beyond the time when such rate, price or charge would otherwise become effective. An order by the department directing a change in any schedule filed shall have the same effect as if a schedule with such changes were filed by the company, and shall become effective from such time as the department shall order.

Unless the department otherwise orders, all contracts for the sale of gas or electricity by gas or electric companies, except contracts for sale by a company whose sole business in this commonwealth is the supply of electricity in bulk, shall be filed with the department and shall not become effective until thirty days after filing. The department may investigate the propriety of any such contract, both before and after such contract has become effective, and may, after notice and a public hearing, make such order relative to the rates, prices, charges and practices covered by such contract as the public interest requires. Any order made under the provisions of this section or of section ninety-three, may be enforced as provided in section seventy-nine. This section shall not apply to contracts for the sale of electricity to any electric company made in accordance with the provisions of section ninety-four A except as therein provided.

Amended by St.1939, c. 178, § 1; St.1948, c. 471; St.1963, c. 615, § 1; St.1973, c. 816, §§ 2, 3.

Mass.Gen.Laws Ann. ch. 164, § 94 (1976).

Mass.Gen.Laws Ann. ch. 164, § 94 (1976) (emphasis added). The portions of the statute italicized above provide that rate increases may take effect *without departmental approval* on the first day of the month next after the expiration of fourteen days from the filing of the new rate schedule, but the department may "otherwise authorize," i.e., advance the effective date or suspend it for a period up to ten months. That the statute is authorizing *unilateral* rate increases is obvious because it provides: "The department may investigate the propriety of any such contract, *both before and after such contract has become effective* ..." (emphasis added). That the Department is authorized to investigate the rate in any contract *"after* such contract has become effective" (emphasis added) clearly indicates that the Act authorizes increased rates to become effective prior to any investigation, hearing, or order of the Department, *i.e., unilaterally.*

Authority for the Massachusetts Department to require a utility to proceed in a manner tantamount to § 206 stems from its authority under the statute, if it acts promptly, "upon its own motion [to] investigate the propriety of any proposed rate ... and ... pending such investigation and decision thereon [but without any required hearing, to] suspend the taking effect thereof ... [for up to] ten months ... and may, after notice and a public hearing, make such order relative to the rates ... as the public interest requires." Proceedings authorized by § 94 of Chapter 164 are therefore analogous in many respects to proceedings authorized under § 205 and § 206 of the Federal Power Act. However, the principal procedure for obtaining a rate increase under § 94 is practically a carbon copy of that under § 205 except for the longer suspension period—ten months under the Massachusetts statute as compared to five months under § 205.

## II. THE DECISION OF THE FEDERAL COMMISSION

With the statutory scheme and the relevant portions of the contract set forth above, the decision of the Commission can be assessed. At the outset, the Commission rejected the contention of New England Power that the contract provided for a fixed rate formula and that its rate provisions could be changed only through bilateral modification, FERC Supplemental Order of Nov. 13, 1984 at 4 (J.A. 219), and held that Holyoke could request rate increases from the Commission under the contract provision in § 6.06(a) "which subjects the contract rate to review *and determination* by the regulatory body having jurisdiction." *Id.* This important ruling is based on the plain wording of the contract and is not challenged on appeal. It authorizes a procedure that was clearly agreed to by the parties when they incorporated Chapter 164 into the power contract to satisfy the requirement of § 94A. The Commission and the majority seem to overlook the fact that § 94A of the Massachusetts statute requires the incorporation of § 94 into the contract for the "review and determination" of the price to be paid for electricity. In addition, the Commission ruled that the state-law procedures referred to in the contract would *not* authorize Holyoke to file rate changes in a unilateral fashion similar to that of § 205 of the Federal Power Act.

### A. *The Substance of the Commission's Decision*

The position of the Commission upon this point, which was controlling in its disposition of this case, is set forth in the following four sentences of its Supplemental Order on rehearing:

■ Since chapter 164 [of Massachusetts General Laws] applies to either procedure [section 93 or section 94 of that chapter] it is not helpful in determining which procedure "may be applicable to this agreement." [2] Further, no provision in the contract specifically provides for general unilateral rate filings. [3] However, the contract clearly envisions prospective regulatory determination of the appropriate rate. [4] Thus, we conclude that the contract contemplates an increase in rates prospective only; that

is, amended contract rates may become effective [only] from the date of a Commission order entered at the conclusion of a section 206 proceeding.

*Id.* at 5 (J.A. 220) (sentences numbered and discussed below).

From the quoted portion of the Commission's Supplemental Order it appears that FERC presumed that the power contract must *specifically* provide that the utility may unilaterally file rate changes in order to permit the utility to file under § 205. While the Commission may apply this more rigorous standard to more recent power contracts, we have specifically declined to apply the presumption retroactively. See, for example, *Cities of Bethany v. FERC,* 727 F.2d 1131, 1144 (D.C.Cir.1984), where we said with respect to a 1965 power contract:

FERC's tendency in recent years to require an explicit expression in private contracts of the parties' intention to permit unilateral filings under § 205 is not highly relevant to the meaning of a provision executed in 1965.

Nothing would be gained by applying the presumption to the contract here, which was executed in 1957. Following is a review of the bases the Commission gave for its decision.

B. *The First Sentence*

In its first sentence above [1] the Commission erroneously construes the Massachusetts statute by interpreting § 94A of Chapter 164 as being satisfied if the contract authorizes "price ... review and determination under either procedure"—§ 93 or § 94—when what should be recognized is that it authorizes proceedings under *both* § 93 and § 94, though § 93 is in no way relevant to a rate *increase* being sought by a utility. *See supra* at 758–759. The Commission's construction of the contract and Chapter 164 is devoid of logical or factual support and completely fails to recognize the provisions of the contract and the scheme of regulation set forth in the Massachusetts statute which is incorporated into the contract by § 6.06(a).

First of all, the terms of the contract *are* specific. To partially repeat, the parties agreed as follows in § 6.06(a):

The prices to be paid for electricity ... *shall* be subject to review and *determination* by the Massachusetts Department ... in *any proceeding* brought under Chapter 164 ... to the extent provided for and *in accordance with the provisions of said chapter, insofar as same may be applicable to this agreement.*

The Commission admits that this contractual provision incorporated § 94A into the contract but overlooks the fact that, as a consequence, such section automatically incorporates both § 93 and § 94. What could be more specific than the parties agreeing that the price of electricity shall be determined in any proceeding brought under Chapter 164? Since "proceeding[s] ... under Chapter 164" may be brought under both § 93 *and* § 94, the above provision plainly incorporates both § 93 *and* § 94 into the contract. And since the Commission has held that Holyoke may initiate rate changes, § 94, which authorizes utilities to initiate rate changes, "may be applicable," and it is the *only* section of the statute that may be applicable to any such proceeding initiated by a utility.

Except for recognizing that § 94 is included as a necessary part of any request for a rate increase, the principal focus of § 93 is to permit consumers and public officials (including the Massachusetts Department of Public Utilities) to file complaints regarding the price of electricity, and for the Department to hold a hearing thereon resulting in a possible price *reduction.* Significantly, § 93 provides that any subsequent *change* in the price fixed in accordance with § 93 "shall not thereafter be changed by said company *except as provided in section ninety-four.*" This statutory reference to § 94 constitutes a legislative command that § 94 complements § 93. Section 94 is the only statutory provision that directly authorizes utilities to file for *rate increases,* since § 93 is generally concerned with rate reductions and is only triggered by public complaints.

Section 94A is equally unequivocal. It provides generally that all contracts must provide that utility prices be subject "to review and determination in any proceeding brought under section ninety-three or ninety-four." As pointed out above, this authorizes the Department to proceed under either statute. Thus, § 94A makes utility prices subject to both sections of the statute, and every contract must so provide. Section 6.06(a) of the power contract complies with this statutory requirement that all power contracts authorize proceedings under § 93 or § 94 and uses the same words as the statute—*"in any proceeding"*—but instead of providing that "proceedings" would only be subject to § 93 and § 94 of Chapter 164 the contract incorporates both of those sections by a broader provision that includes "any proceeding brought under Chapter 164 ... to the extent provided for and in accordance with the provisions of said chapter, insofar as same may be applicable to this agreement."

There is no difficulty in interpreting this as including § 93, § 94, and § 94A in the contract, and possibly expanding the incorporation even beyond that to include other provisions in the Massachusetts statute. It is absurd to conclude that the parties intended to exclude § 94, the *exclusive provision for rate increases*, when *both* § 93 and § 94A *specifically* adopt § 94, and § 94A requires that "any proceeding" for a price increase be subject to review and determination under § 94. The three sections are *in pari materia* and must be read together. *See United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *FTC v. Manager, Retail Credit Co.*, 515 F.2d 988, 995 (D.C.Cir. 1975).

To restrict the application of § 94 to the rare instances where rate increases are sought after a rate reduction, thus eliminating its application to requests for all normal rate increases, would violate the terms of the statute. *Nothing in the record supports such construction of the statute.* And even if two interpretations were possible—one that incorporates § 94 as required by § 94A, and one that incorporates it only in part for the limited purpose of § 6.06(b)—that interpretation should be adopted which complies with the law rather than one that would make the contract illegal by not including § 94. *Great Northern Ry. v. Delmar Co.*, 283 U.S. 686, 691, 51 S.Ct. 579, 581, 75 L.Ed. 1349 (1931); *Eddy v. Prudence Bonds Corp.*, 165 F.2d 157, 161 (2d Cir.1947), *cert. denied*, 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948); *American Machine & Metals, Inc. v. DeBothezat Impeller Co.*, 180 F.2d 342, 347 (2d Cir.) (because of doubts as to a contract's legality "the court will presume that the parties did not intend to make an illegal contract"), *cert. denied*, 339 U.S. 979, 70 S.Ct. 1025, 94 L.Ed. 1383 (1950); Restatement (Second) of Contracts § 203 (courts prefer an interpretation which gives a reasonable and lawful meaning to all terms in a contract to an interpretation which leaves a part unreasonable or unlawful).

### C. *The Second Sentence*

The second sentence of the Commission's opinion [2] is similarly mistaken in asserting: "Further, no provision in the contract *specifically* provides for general unilateral rate filings." (J.A. 220) (emphasis added). However, § 6.06(a) of the contract specifically provides for general unilateral rate filings when it states that prices for electricity shall "be subject to *review and determination*" by the Department in *"any proceeding"* under Chapter 164. The contract thereby incorporates § 94, which is a part of Chapter 164, and that section specifically authorizes general unilateral rate filings as pointed out *supra* at pp. 758–759.

### D. *The Third Sentence*

In the third sentence [3] the Commission states that "the contract clearly envisions prospective regulatory determination of the appropriate rate." This language of the Commission means amended contract rates may become effective only from the date of a Commission order entered at the conclu-

sion of a § 206 proceeding. *See* sentence [4]. Section 93 which by its terms is available only to public officials and consumers is clearly a regulatory determination of this order. But recognizing the existence of prospective rate determinations under § 93 does not justify failing to recognize that the very same statute specifically authorizes and requires *other* rate changes to follow the § 94 procedure. And § 94 is even clearer in recognizing that rate increases may be *unilateral* when it provides: "The department may investigate the propriety of any such contract, both before *and after* such contract has become effective ..." (J.A. 233) (emphasis added). Failing to recognize the applicability of § 94 is erroneous, to repeat, because the parties agreed in § 6.06(a) of the contract that "prices ... shall be subject to ... *determination* ... in *any proceeding* brought under Chapter 164...." That provision incorporates § 94 and its unilateral method of securing a rate increase. *Supra* at 763. The fourth and final quoted sentence [4] is simply a reiteration of the erroneous result based on the incorrect premises set forth above.

### III. THIS COURT'S JURISDICTION UNDER THE PETITION FOR REHEARING

Prior to addressing the majority's arguments, the jurisdictional posture of this case must be clarified. The majority responds to the interpretation of the contract in this opinion by asserting in a footnote

6. In the same footnote the majority opinion asserts that a correct reading of § 93 "provides no basis for reversing the portion of the Commission's decision which is before us." Maj. Op. at n. 5. The majority contends that if Holyoke cannot proceed under § 93, then "the Commission arguably erred by allowing Holyoke to seek a prospective rate increase from the Commission. But as all the parties and the dissent recognize, '[t]his important ruling ... is not challenged on appeal.'" Maj. Op. at n. 5. The majority misunderstands the dissent's reference to the Commission's ruling: The ruling not challenged on appeal is the Commission's ruling that Holyoke is permitted by the contract to file for rate increases (whether unilateral or prospective). No party contests this ruling on appeal. What the parties vigorously contest on

that the court lacks jurisdiction to pursue such an inquiry, to wit:

The dissent would grant Holyoke's petition for review on the ground that the Commission failed to recognize that Holyoke's own interpretation of the statute was, in point of fact, erroneous.... We do not, however, reach the merits of the dissent's statutory analysis. This court lacks jurisdiction to reverse the Commission on the basis of an error raised by the court *sua sponte* if the error was not "urged" before the Commission in the rehearing application.... *A fortiori*, we may not reverse the Commission for relying on petitioner's own interpretation of Massachusetts law.

Maj. Op. at n. 5 (emphasis added).[6] *But the error was urged in the rehearing application.* Holyoke specifically raised the issue *in its Request for Rehearing*, from which is taken the following quotation:

The Commission's disallowance of the right to file unilateral rate increases is in error and is unsupported by both a fair reading of the applicable language of the Power Contracts and an analysis of the rate review mechanisms of Chapter 164 of the General Laws of Massachusetts.

. . . . .

... [T]he parties inserted a *broad* rate review mechanism by referring in Section 6.06(a) to *"any* proceeding" under Chapter 164; thereby incorporating *both* the Section 93 *and* the Section 94 rate review mechanisms. As the Commission

appeal is whether Holyoke's filing may be unilateral or of prospective effect only.

Notwithstanding the majority's misplaced reliance on *SEC v. Chenery*, it is clear that a reviewing court must determine all properly presented legal arguments that affect the ultimate disposition of a case. It is the majority's refusal to acknowledge that the basis of this dissent was "urged" before the Commission that permits the majority to offer the strawman it refutes by misinterpreting *SEC v. Chenery*. *Chenery* holds that an agency decision cannot be upheld on grounds not relied upon by the agency. This rule cannot be expanded to block a court from overturning an agency decision on grounds that were properly raised by a petitioner, but which the agency refused to recognize.

acknowledged in the Supplemental Order, Section 93 reflects a rate change procedure similar to Section 206 of the Act and *Section 94 is a unilateral rate change mechanism parallel to that found in Section 205 of the Act.* (J.A. 224–25) (emphasis added). The italicized language clearly raised the *exact* point that Holyoke urges here. Holyoke could not more specifically have indicated its reliance on § 94 of Chapter 164, and the contract between the parties, to support its claimed right to file a unilateral rate increase as is authorized by § 94 and § 205.

Of course, the relevant statute does require that "[n]o objection to the order of the [Federal Energy Regulatory] Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing ..." 16 U.S.C. § 825 *l* (b) (1982). This exhaustion requirement sensibly requires that the agency receive notice of the grounds of error "sufficient to alert the commission to particular and possibly remedial problems." *Rhode Island Consumers' Council v. FPC,* 504 F.2d 203, 213 (D.C.Cir.1974) (construing § 19(b) of the Natural Gas Act), We have similarly held that

> [the statutory exhaustion requirement] *does not preclude appellate consideration of an argument in support of a properly preserved ground of error.* Read in the entirety, [petitioner's] application [for rehearing] gave notice to the Commission with sufficient clarity regarding the grounds on which it urged reconsideration. This fulfills the statutory requirement.

*Belco Petroleum v. FERC,* 589 F.2d 680, 683 (D.C.Cir.1978) (construing § 19(b) of the Natural Gas Act). In other words, a party who contests solely the amount of a rate filing before the Commission under § 205, for example, cannot for the first time on appeal challenge the legality of the filing under *Mobile-Sierra.* The exhaustion requirement does not prohibit an appellate court from considering more elaborate legal arguments on properly preserved

grounds of error, but even this expansion of the general rule need not be relied on here.

It is plain that Holyoke's Request for Rehearing (J.A. 222–28) provided adequate notice to alert the Commission to its primary assignment of error—namely, that the rate filing should have been accepted as a unilateral filing under § 205 of the Federal Power Act.

The majority opinion does not dispute that the above asserted error was urged before the Commission. Rather, the majority asserts that "Holyoke expressly conceded before the Commission and this court that the requirement for regulatory oversight in section 94A of Chapter 164 may be satisfied by subjecting the contract price to review and determination under *either* section 94 or section 93." Maj. Op. at 758 (emphasis in original). It hardly amounts to much of a concession for Holyoke to reiterate the express terms of § 94A, *see supra,* but this otherwise irrelevant point is accorded significance only because of the majority's implicit, and surely wrong-headed, assumption that a utility can file for rate increases under either § 93 or § 94 of Chapter 164. That the majority makes this erroneous assumption is obvious considering the majority's subsequent statement distinguishing this case from that of *Richmond Power & Light v. FPC,* 481 F.2d 490, 500 (D.C.Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973), a reference that implies that the present power contract would permit a *utility* to file for a *rate increase* under both § 93 and § 94. In fact, Holyoke *never* so conceded before either the Commission or this court. Holyoke asserted that "review of rate changes" could be accomplished "under Section 93 or 94" but never admitted that a utility could *initiate* a rate increase under § 93, for the obvious reason that § 93 does not authorize *utilities* to invoke the complaint procedure or to initiate rate increases. Holyoke so alleged in its Answer to the Pleading of August 23, 1984 of New England Power Company, to wit:

Within Chapter 164, Sections 93 and 94 provide the procedural framework for accomplishing rate revisions in Massachusetts, as well as the substantive standards for acting upon applications for rate revisions. *Section 93 provides for a DPU [Department of Public Utilities] proceeding initiated upon complaint by certain buyers, and other [public] persons* and is a mechanism equivalent to Section 206 of the Federal Power Act.

Most importantly, *Section 94 provides for unilateral filings by public utilities selling energy,* subject to the review of the DPU.... In essence, Section 94 is (and was in 1957 when the relevant contract was agreed to) a rate change mechanism almost identical to Section 205 of the Federal Power Act.

(J.A. 198–99) (footnote omitted) (emphasis added). In its brief to this court Holyoke makes the same point:

*Section 93 provides for a DPU proceeding initiated upon complaint by buyers and other persons* and provides for prospective regulatory determination of reductions or changes in existing rates. *Section 94, on the other hand, provides for unilateral rate filings by public utilities* subject to DPU review.

Holyoke Brief at 24 (emphasis added). To repeat, § 93 is not available to Holyoke or any utility seeking a rate increase and its relevance to this case, if any, is minimal at best; § 94 is the only authority for a utility to *initiate* a rate increase.

The error assigned by petitioner, as indicated above, was that the rate filing should have been accepted under § 205 of the Federal Power Act as the parties had agreed to a similar procedure by incorporating § 94 into the contract as part of Chapter 164. In order to resolve this question the Commission was required by *Mobile-Sierra* to consult the power contract. The power contract in turn required the Commission to determine what type of filing was permitted under Chapter 164 of Massachusetts General Laws because such laws were incorporated into the contract, and § 93 and § 94 are part of that chapter.

The argument proffered by this dissent flows not from a new or obscure source, but from the plain reading of the Massachusetts law that was *necessarily considered by the Commission.* Moreover, no court should accept the majority's implicit conclusion that a party may "concede" an erroneous construction of a pure matter of law, thereby creating a precedent that saddles the agency, the reviewing court, and perhaps even future litigants with an incorrect interpretation of the statute.

## IV. THE MAJORITY OPINION

Untroubled by analysis, the majority affirms the Commission in an opinion that compensates in brevity for what it lacks in substance. The majority addresses what it characterizes as Holyoke's chief assignment of error, namely that Chapter 164 "unequivocally evinces the intent of the parties to subject the contractual rate formula to [the unilateral rate filing method of] section 94." Maj. Op. at 757. The majority rejects the clarity proffered by Holyoke for two reasons. First, the majority construes the *mutatis mutandis* clause of § 6.06(a) ("insofar as the same may be applicable to this agreement") as evidence of equivocation. Second, the majority contends that "Holyoke expressly conceded before the Commission and this court that the requirement for regulatory oversight in section 94A of Chapter 164 may be satisfied by subjecting the contract price to review and determination under *either* section 94 or section 93." Maj. Op. at 758. Having thus persuaded itself by its mistaken construction that the power contract does not "unequivocally" incorporate § 94, the majority undiscriminatingly asserts that the specific allowance of a unilateral rate filing under certain circumstances, provided in § 6.06(b) of the contract, falls within the interpretive doctrine of *expressio unius est exclusio alterius, i.e.,* that which was not included in the contract is excluded. Maj. Op. at 758–59.

In my opinion none of these contentions withstand even the most cursory analysis. Consider the paucity of support for the

majority's contention that the contract does not include the unilateral rate filing mechanism of § 94. The majority inexplicably relies on the *mutatis mutandis* clause ("insofar as the same may be applicable") in order to contravene the specific terms of the agreement. This argument is reminiscent of the man arrested for walking on the courthouse lawn where the sign said, "Keep Off the Grass." In defense he argued, "But the sign doesn't say positively." The majority surely cannot intend that this standard contractual phrase ("insofar as the same may be applicable") will hereafter be included in power contracts at the expense of the specific terms of the contract, yet this is the import of their opinion.

Makeweight arguments like the majority's attack on the *mutatis mutandis* clause might be unobjectionable if joined with arguments of greater substance, but that unfortunately does not characterize the majority opinion. Immediately following the *mutatis mutandis* assertion the majority opinion relies on Holyoke's reiteration of the terms of § 94A in order to undermine Holyoke's argument that the contract incorporated § 94. If the "concession" that the procedures required by § 94A govern the instant power contract is grounds for the Commission's exclusion of § 94, one might extend the majority's logic to ask whether the inclusion of § 94A in Chapter 164 itself provides cause to doubt that § 94 indeed is a viable part of that chapter. The answer is obvious.

Following this unsupported "concession," the majority attempts to wring out a relevant "admission" with respect to § 93 by contending:

Holyoke's *admission* that Massachusetts law permitted "the parties [to] include Section 93 as the only rate review mechanism in their contract," Brief for Petitioner at 27, is quite significant because Section 93 provides for rate changes effective only upon regulatory approval.

Maj. Op. at 758 (emphasis added). Actually there is nothing "significant" about Holyoke's statement because, as the majority fails to state and as is stated elsewhere in

the contract, § 93 is *not* the *only* rate review mechanism in the contract. The issue raised by the Commission is *not* the plain meaning of § 93 but the extent to which the incorporation of Chapter 164 into the contract included §§ 93, 94, and 94A. Holyoke's brief at pages 27–28 does *not* make any "admission" that supports the above quoted assertion in the majority opinion. The full statement in Holyoke's brief at pages 27–28 follows:

Had the parties included Section 93 as the only rate review mechanism in their contract, the Holyoke Companies' right to seek immediate effectiveness for changes to the Power Contracts would have been limited. To the contrary, the parties did not so limit the Holyoke Companies' rights to secure contract changes. By including the language of Section 6.06(a) in the Power Contracts, and thereby providing for the entire range of regulatory review available pursuant to Chapter 164, the parties agreed to permit unilateral filings by the Holyoke Companies under Section 94 procedures, as well as complaint proceedings initiated under Section 93. When the jurisdiction of the Commission over the contract subsequently was established, the Power Contracts therefore expressly recognized that filings could be made under Section 205 of the Act, as well as complaints under Section 206.

Holyoke Brief at 27–28 (footnote omitted).

It seems clear therefore that the majority has disregarded the scheme for securing rate increases that is specifically provided for in the Massachusetts statute. Starting with the uncontested holding of the Commission that the power contract permits utilities to *initiate* rate changes, the relevant procedure under Massachusetts Chapter 164 is clear. Section 94A provides that rates shall be determined "in *any proceeding* brought under section ninety-three *or* ninety-four" (emphasis added). Although § 94A permits rate changes under either § 93 or § 94, it is quite clear that *no utility can initiate a rate change under § 93*. Section 93 procedures can be used only by

"the [state] attorney general, or the mayor of a city, or the selectmen of a town, or of twenty customers thereof ..." or the Department. Therefore, since Holyoke admittedly has the right to initiate rate increases, as the Commission held, and § 93 is *not* available to utilities for such purposes, the *only* applicable statutory procedure available when Holyoke proposes a rate increase in the unilateral filing method provided by § 94. This case, then, is precisely the type of case in which state law permits a *utility* seeking a rate increase to make only one type of initial filing, *i.e.,* that under § 94. *See Richmond Power & Light v. FPC,* 481 F.2d 490, 500 (D.C.Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).

The rough analogy between § 93 and § 94 of Chapter 164 and the Federal Power Act thus collapses because § 94 does not authorize *initial* filings for rate increases by utilities. Under the Federal Power Act a utility can file a rate change under either § 205 or § 206, the major practical difference being the time at which the rate increase takes effect. By contrast, § 93 of Chapter 164 is limited to providing the means by which consumers and public representatives can petition for rate *reductions* and changes. *See* Note, *State Administrative Practice: An Illustrative Survey of the Procedure of the Massachusetts Department of Public Utilities,* 67 Harv.L.Rev. 845, 848–52 (1954). The only procedure under Massachusetts law by which a utility may *initiate* rate increases is the method provided by § 94 which in its initial stages is essentially unilateral. That the contract does not refer *specifically* (not "unequivocally" to use the majority's characterization) to § 94, is no more relevant than that it does not refer specifically to § 93 or § 94A, because initial rate filings by a utility under Massachusetts law can *only* be effected through the procedures of § 94. And § 94, along with § 93 and § 94A, are effectively incorporated by the contractual inclusion of Chapter 164 "insofar as the same *may* be applicable to this agreement" (emphasis added). There is no doubt that *both* § 93 and § 94 "may be

applicable to [the] agreement." And it is important to note that the power contract limited any deviation from the Massachusetts statute by providing that *all rate determinations* under Chapter 164 must be *"in accordance with the provisions of said chapter,"* § 6.06(a) (J.A. 86) (emphasis added), and § 94A of the chapter requires that price determination proceedings be subject "to review and determination" under either § 93 or § 94 as same may be applicable. Thus, the power contract cannot reasonably be construed to limit compliance with § 94 solely to proceedings involving rate increases following ordered rate reductions.

The third point relied on by the majority—the unilateral rate filing permitted by § 6.06(b) of the contract—cannot alone bear the weight of the disposition in this case. This clause is intended for, and is limited to, the rare situation where a rate increase is requested right after a mandatory rate reduction has been ordered, and is perfectly consonant with § 93 of Chapter 164. Indeed, the status of the complaint procedures specified in § 93 are *inseparable* from the rate filing procedures specified in § 94, since the language of § 93 specifically provides, in the event of a rate reduction by order of the Massachusetts Department of Public Utilities, that "[t]he price or prices fixed by any such order shall not thereafter be changed by said company *except as provided in section ninety-four."* This recognizes that § 94 is the *only* provision available to a utility to file for a rate increase. The scheme of the Act thus puts each section in its proper place—§ 93 for rate complaints and § 94 for utilities *initiating* rate increases. There is thus no sound basis for the Commission and the majority to assert that the parties intended that § 6.06(b) of the contract should preclude Holyoke from filing for a unilateral rate increase under § 94.

It is obvious that the intent of the parties in § 6.06(b) was to allow Holyoke to file for a rate increase following a mandatory rate reduction, *but to limit Holyoke to an increase in an "amount no greater than*

*[before the] reduction."* In this provision the contract recognizes that without this contractual restriction Holyoke could permissibly file for a greater rate increase under § 94. Contractually limiting a subsequent application for a rate increase after a rate reduction to an amount not to exceed the prior rate is a perfectly reasonable provision that provides mutual protection to the parties. Holyoke is afforded an opportunity to recoup its loss and the customer is guaranteed that the prior rate will not be exceeded. There is no reasonable basis, however, and no support in the record, for construing § 6.06(b) so as to distort the entire contract and prevent Holyoke in other circumstances from using the exclusive statutory method for obtaining a rate increase, *when the Commission has held, as here, that Holyoke may file for rate increases.* As stated above, there is no support in the record, or in law, for the crabbed construction that the Commission and the majority give to § 6.06(b) of the contract, which does gross violence to the plain intent of the parties and the requirements of the Massachusetts statute.

## V. CONCLUSION

As the Commission held, the contract authorizes Holyoke to initiate rate increases pursuant to Massachusetts law. The only procedure for initiating rate changes available to a utility under Massachusetts law is the method prescribed by § 94, under which a utility may unilaterally initiate a rate change to take effect immediately, or after a ten-month period if suspension is ordered. This unilateral procedure is prescribed by the plain language of the Massachusetts statute which is incorporated into the contract, and our analysis under *Mobile-Sierra* must be in accord.

It is my opinion, therefore, that the court should reverse the decision of the Commission holding that the rate filing by Holyoke under § 205 of the Federal Power Act was illegal and remand the case to the Commission for further consideration not inconsistent with this opinion. Because the Commission's decision is based on an erroneous interpretation of law and of the contract, our deference is neither required nor advisable. I respectfully dissent.